UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF NORTH CAROLINA
GREENSBORO DIVISION

| | | |
|---|---|---|
| In Re: | ) | Chapter 11 |
| | ) | |
| NCOAT, INC., et al., | ) | Case No. 10-11512 |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| _____ | ) | |

**OBJECTION TO SALE OF DEBTOR'S ASSETS**

COMES NOW, the Official Committee of Unsecured Creditors for nCoat, Inc. (the "Committee"), by and through its undersigned counsel, and hereby objects to the Motion to (A) Approve Sale of Substantially All Assets, (B) Establish Related Sale Procedures and Approve Break-up Fee, (C) Transfer Any and All Claims, Liens, Encumbrances and Interests in Sale Assets to Proceeds of Sale, (D) Approve Form and Manner of Notice of Sale, (E) Assume and Assign Certain Leases and Executory Contract, and (F) Schedule Hearings to Establish Sales Procedures and Confirm Sale (the "Sale Motion") filed by debtor nCoat, Inc. (the "Debtor") and affiliated entities nTech, Inc. ("nTech"), MCC, Inc. ("MCC") and High Performance Coatings, Inc. ("HPC") (The Debtor, nTech, MCC, and HPC are referred to collectively herein as the "Debtors"). In support of its Objection, the Committee respectfully states as follows:

**Background**

1. On August 16, 2010 (the "Petition Date"), the Debtor filed for protection under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Middle District of North Carolina.

2. In addition to several of the typical first day motions expected in a chapter 11 case, on the Petition Date, the Debtor also filed the Sale Motion, seeking approval of the sale by auction (the "Sale") of substantially all of its tangible and intangible assets (the "Assets").

WCSR 4460830v1

Pursuant to the Sale Motion, the Debtor seeks approval to have Fort Ashford Funds, LLC ("Fort Ashford"), the party with whom it has spent several months negotiating the sale of its business pre-petition, serve as a stalking horse with an initial bid for the Assets of $1 million dollars.

3. The Debtor also filed on the Petition Date a motion to (a) determine whether certain agreements are true leases or secured financing statements, and (b) authorize Debtors to assume, assign or reject executory contracts and unexpired leases (the "Lease Motion"). The Lease Motion included as one of the true leases to be assumed and assigned or rejected a lease agreement (the "Lease") dated February 21, 2006, between HPC and Mebane Warehouse, LLC (the "Landlord") and sought entry of an order that the Lease could be assumed and assigned or rejected as part of the sale process.

4. However, pre-petition, on June 29, 2010, counsel for the Landlord sent a letter to HPC and guarantor NanoCoat, Inc. demanding payment of $215,315.99 in unpaid rents due under the Lease. On July 7, 2010, the Landlord's counsel sent a letter to the same two parties informing them that they were in default under the Lease and that the Landlord was terminating the Lease.

5. No where does the Lease Motion disclose that the Lease was terminated pre-petition or even state that the Landlord purports to have terminated the Lease pre-petition.

6. On August 19, 2010, the Landlord filed a Limited Objection to the Sale Motion and the Motion to Assume and Assign (the "Landlord's Objection") arguing that the Debtor's interest in the Lease was abandoned and that the automatic stay should be modified to allow the Landlord to obtain immediate possession of the property. The Landlord's Objection was resolved by the Order Modifying Automatic Stay and Approving Compromise with Mebane Warehouse, LLC, which was entered September 8, 2010, and which approved a compromise

under which a certain percentage of the property is leased to a third party and the Lessee is allowed to continue to occupy the property through October 31, 2010, provided that the Debtors or the successful purchaser of the Assets either (i) negotiates and executes a new lease with the Landlord by October 1, 2010 or (ii) vacates the premises and removes all the Debtors' personal property from the premises on or before October 31, 2010.

7. Also on the Petition Date, the Debtor filed a motion to shorten notice and expedite hearing on a number of its motions, including the Sale Motion (the "Motion to Expedite"). The Motion to Expedite failed to specifically explain to creditors why the Sale must be expedited.

8. On September 2, 2010, the Court entered an Order granting in part and continuing in part a number of first day motions, including the Sale Motion. While the Order approved the auction procedures for the sale of the Debtor's Assets, including the minimum overbid requirement and a break-up fee of up to $100,000, it left certain issues to be determined at a later date, such as the exact amount of the break-up fee and final confirmation of the Sale. The Order set a final hearing on the Sale for September 23, 2010.

9. That same day, the Court entered an Order appointing the Committee in this case. However, the first meeting of the Committee organized by the Bankruptcy Administrator did not take place until September 9, 2010.

10. The Committee obtained counsel to represent its interests and its counsel was approved *nunc pro tunc* to September 9, 2010 by order dated September 15, 2010.

**Argument**

**The proposed Sale is not in the best interests of creditors and should not be approved.**

11.     With the $1,000,000 sale price for all of the Debtors' Assets and general unsecured claims against the Debtor alone totaling over $12 million, it is clearly the general unsecured creditors who will bear the brunt of this Sale and risk that the assets are being sold out from under the Debtor's estate.  The impact on the general unsecured creditors is further exacerbated by the fact that the Asset Purchase Agreement between the Debtors and Fort Ashford calls for Fort Ashford to recover completely its $142,500 pre-petition loan and any amounts lent post-petition before any cash even reaches the estates.

12.     The Debtor has failed to present any evidence that the proposed sale price is reasonable and represents a fair market value for the assets being sold or that, in its business judgment, the Sale is in the best interests of the Debtor's creditors.  In the Committee's opinion, the $1,000,000.00 sale price is below market value for the Assets being sold.

13.     While the Assets were subject to auction, there is no evidence that the particular auction at issue assured a fair market price.  To the contrary, for several reasons, it seems likely this particular auction did not.  First, while the Order approving the sale procedures was entered on September 2, 2010, the deadline for submitting qualifying bids was September 13, 2010, creating a very short time frame within which the Assets could be marketed to potential bidders.  Second, the Debtor has not presented any evidence that it sufficiently marketed the Assets to ensure the auction would result in the best sale price.  Third, the sale terms included a minimum overbid of $100,000 and proposed a break-up fee of up to $100,000, which is ten percent of the total sale price.[1]  Arguably, these factors may have chilled competitive bidding.

---

[1] At the September 9, 2010 hearing, the Court provided the Committee and other opportunity to object to the Break-Up Fee, which Fort Ashford claimed should encompass the entire $100,000.  Because there were no competing bids,

14. In fact, on information and belief, there were at least two other bidders who were interested in the Assets, but were dissuaded from bidding by the speed of the auction process. Committee counsel has requested information from the Debtor's counsel about these prospective bidders, including their names and contact information, but has not yet received this information.

15. In addition, on information and belief, there are some general unsecured creditors who may be interested in purchasing or supporting these Assets to preserve their value for the benefit of the general unsecured creditors. However, again because of the expediency of the sale process, these interested parties have not had the opportunity to conduct any due diligence or make a proposition.

16. On information and belief, the sale may not have been conducted at arms length. On information and belief, the Debtor and Fort Ashford have been negotiating this sale for months. Fort Ashford has had the opportunity to conduct extensive due diligence that creditors and potential bidders have not. The Committee would like the opportunity to question the Debtors and Fort Ashford regarding what benefits the Debtor or its management may be receiving from this sale at the expense of the Debtors' creditors.

17. Because the proposed sale involves all of the Debtor's assets, it is essentially a *sub rosa* plan and, as such, necessitates an even higher degree of review and inspection. "Because there is some danger that a section 363 sale might deprive parties of substantial rights inherent in the plan confirmation process, sales of substantial portions of a debtor's assets under section 363 must be scrutinized closely by the court." In re Cloverleaf Enterprises, Inc., Case No. 09-20056, slip op., 2010 WL 1445487, at *2 (Bankr. D. Md. April 2, 2010) (citing Collier on Bankruptcy para. 361.02[3] at 363-17 (15th ed. Rev. 2009)); see Pension Benefit Guaranty

---

this issue now appears moot. However, the Committee respectfully preserves its argument that the break-up fee proposed here is not commensurate with any value provided the Estate, is excessive, and should not be allowed.

Corporation, Continental Airlines, Inc. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.), 700 F.2d 935, 940 (5th Cir. 1983). In fact, sales of all assets outside of a plan in a case under Chapter 11 are "extraordinary" and "should be viewed as an exception to the rule." Cloverleaf, 2010 WL 1445487, at *2.

**The damages to creditors in approving the Sale outweighs any benefits provided by fast-tracking it.**

18. On information and belief, the Debtor contends that the sale had to be conducted on an expedited basis because of issues surrounding the Lease. The explanation, however, does not hold water for several reasons. First, the Lease is not even an asset being sold and the Debtor is not attempting to assume and assign the Lease under the Sale Agreement. Any successful purchaser of the Assets, including Fort Ashford, would have to move them to another location or negotiate a new lease with the Landlord anyway.

19. While the arrangement reached between the Debtor and the Landlord provides that there must be a new lease negotiated with the landlord by October 1, 2010 and that the Debtor must vacate the premises by October 31, 2010, such terms do not explain why bids had to be received by September 13, 2010. There may have been and may still be potential purchasers willing to buy the assets regardless of the Lease status or who may be willing and able to negotiate a resolution with the Landlord prior to October 1, 2010.

20. Finally, the expediency that works to the Debtor's and, especially, Fort Ashford's advantage here may have been self-imposed. If so, approving the sale would be rewarding those with unclean hands. The first default letter from the Landlord was dated June 29, 2010. The second letter terminating the Lease was dated July 7, 2010. On information and belief, based on prior hearing testimony, Fort Ashford was working on the sale at this time and may have had a person on site with the Debtor to help with its bankruptcy preparations. If Fort Ashford was

interested in negotiating a new lease with the Landlord, it had plenty of time to do so.  Likewise, if the Debtor was interested in obtaining a fair price for its assets, it could have put them up for sale and given potential purchasers time to negotiate with the Landlord as well.  In addition, the Committee questions how and why the Debtors or their principals or those conducting due diligence at the time allowed the Lease to be terminated, thereby losing an important asset of the HPC estate.  It seems inequitable to allow the Debtors to sell and Fort Ashford to buy the Debtors' assets at a fire sale price when either or both parties may have been in a position to prevent the fire in the first place.

21.     The inequity of approving the Sale is further evident when weighing the benefits and detriments of postponing final approval of the Sale.  Extending out the time by two weeks to allow creditors and potential purchasers to consider the purchase of these assets and/or to negotiate potential lease terms with the Landlord would not cause significant harm to any party.  Two weeks still allows the Debtors time to evacuate the premises by the October 31, 2010 deadline and allows any potential purchaser to negotiate a deal with the Landlord if so inclined.  Fort Ashford has not indicated that it will not be able to purchase the Assets two weeks from now if, in fact, no additional offers or solutions come to fruition.  At the same time, should the sale to Fort Ashford of substantially all of the Debtor's Assets for $1,000,000 be approved and confirmed, the damages to creditors in this case will be not only tremendous, but at that point, irreversible.

WHEREFORE, for the reasons expressed above, the Committee respectfully requests that this Court not approve the Sale or the Break-Up Fee and provide such other and further relief as is just and appropriate under the circumstances.

This the 20th day of September, 2010.

WCSR 4460830v1

   /s/ William B. Sullivan
William B. Sullivan (NC Bar No. 17758)
Julie B. Pape (NC Bar No. 27674)
Jennifer B. Lyday (NC Bar No. 39871)
Womble Carlyle Sandridge & Rice PLLC
One West Fourth Street
Winston-Salem, NC   27101
Telephone: 336-721-3715
Facsimile: 336-726-8072

*Counsel for the Official Committee of
Unsecured Creditors of nCoat, Inc.*

WCSR 4460830v1

# CERTIFICATE OF SERVICE

I hereby certify that the foregoing OBJECTION TO SALE OF DEBTOR'S ASSETS was filed electronically in accordance with the local rules and was properly served on the parties listed below via CM?ECF service and via email this 20th day of September, 2010 and by United States Mail, first class postage prepaid on the 21st day of September, 2011:

| | |
|---|---|
| John A. Northen, Esq. | jan@nbfirm.com |
| Vicki L. Parrot, Esq. | vlp@nbfirm.com |
| Stephanie Osborne-Rodgers | sor@nbfirm.com |
| 1414 Raleigh Road, Ste. 435 | |
| PO Box 2208 | |
| Chapel Hill, NC 27514-2208 | |
| | |
| Michael D. West | |
| Robert E. Price | Robert_Price@ncmba@uscourts.gov |
| Bankruptcy Administrator | |
| 101 S. Edgeworth St. | |
| P. O. Box 1828 | |
| Greensboro, NC  27402 | |
| | |
| Charles M. Ivey, III | cmi@igmt.com |
| Ivey , McClelland, Gatton & Talcott, LLP | |
| PO Bo 3324 | |
| Greensboro, NC 27402 | |
| | |
| Gregory B. Crampton, Esq. | gcrampton@nichollscampton.com |
| Kevin L. Sink, Esq. | ksink@nichollscrampton.com |
| Nicholls & Crampton, P.A. | |
| 3700 Glenwood Avenue, Suite 500 | |
| PO Box 18237 | |
| Raleigh, NC 27619-8237 | |

    /s/ Julie B. Pape
Julie B. Pape
North Carolina State Bar No. 27674
WOMBLE CARLYLE SANDRIDGE & RICE, PLLC
One West Fourth Street
Winston-Salem, NC   27101
Telephone:     (336) 721-3715
Facsimile:     (336) 726-8072

*Counsel for the Official Committee of Unsecured Creditors of nCoat, Inc..*

WCSR  4460830v1
WCSR  4455491v1